UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| Donna Norton, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>Lakeside Family Practice, P.A. )<br>)<br>    Defendant. ) | CIVIL ACTION NO. 05-36-P-S |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The issue before the Court is the precise amount of damages that should be awarded to Plaintiff in this case. Default was entered against Defendant Lakeside Family Practice ("LFP") on April 14, 2005. The Court held a damages hearing on July 25, 2005. At this hearing Defendant appeared for the very first time with counsel. Defense counsel was permitted to ask questions and otherwise present any evidence on the issue of damages, however, its presentation was limited to a brief cross-examination of Plaintiff. At the close of the damages hearing, the Court requested that Plaintiff provide the Court with proposed findings of fact and conclusions of law and also allowed Defendant an opportunity to file any proposed findings of fact and conclusions of law or objections to Plaintiff's filing. Defendant has not provided the Court with any written submission. However, the Court has reviewed and considered the proposed findings of fact and conclusions of law submitted by Plaintiff as well as the testimony presented at the damages hearing. In accordance with Federal Rules of Civil Procedure 52 and 55(b), the Court now GRANTS Plaintiff's Motion for Entry of Default Judgment (Docket # 7) and makes the following findings of fact and conclusions of law:

1

**I.     FINDINGS OF FACT**

Norton was hired to work for LFP, a small medical office with three physicians on May 28, 2002.  (See Pl.'s Compl. ¶ 13.)  Norton worked as a medical assistant for LFP for approximately nine months before her termination.  At the time of her termination, Norton was working approximately three days per week, she earned $9.00 per hour, and also received health insurance coverage through LFP.  (See Pl.'s Testimony at the July 25, 2005 Damages Hearing (hereinafter "Pl.'s Test.").)  Even before she began working at LFP, Norton was also a patient of the practice.  (See Pl.'s Compl. ¶ 18; Pl.'s Test.)

In January 2003 Norton suffered a whiplash-type injury while snow tubing.  (See Pl.'s Test.)  Her injury was compounded by an underlying medical condition, which was diagnosed at the time as conversion disorder and has more recently been diagnosed as a spinal cord injury.  (See Pl.'s Test.)  As a result of her injury and her underlying medical condition, Norton experienced symptoms of severe pain and partial paralysis and was temporarily unable to work.  (See Pl.'s Test.)  During this time, Norton was seeing her LFP physician, Dr. Bethany Lake, M.D., for treatment.  (See Pl.'s Test.)  On February 28, 2003, Norton spoke with Dr. Lake about the difficulties she was having with returning to work.  Dr. Lake recommended that Norton work a half-day schedule at first.  (See Pl.'s Test.)

As a result of this recommendation, Norton contacted the LFP Office Manager and asked to work a modified half-day schedule.  (See Pl.'s Test.)  That same evening, the Office Manager telephoned Norton and stated that LFP could not continue Norton's employment in light of her disability.  (See Pl.'s Test.)  When Norton asked specifically whether LFP was terminating her

employment because of her disability, the Office Manager answered, "Yes." (See Pl.'s Test.) Norton responded that it was illegal to fire someone because of her disability. (See Pl.'s Test.) Nevertheless, Norton received a termination letter a few days later. (See Pl.'s Test.) Norton's health insurance was cancelled at the time of her termination, and she was not notified of any options for continuing her coverage. (See Pl.'s Test.) As a result, Norton was without health insurance until April 1, 2003 when she was able to obtain coverage through her husband's health insurance. (See Pl.'s Test.)

Shortly after her employment with LFP was terminated, on March 11, 2003, Norton received a letter from LFP stating that, in light of Norton's implied legal action against LFP, Norton was being terminated as a patient of LFP. (See Pl.'s Test.) At the time of her termination and continuing until mid-April 2003, Norton required ongoing medical care for the symptoms of severe pain and partial paralysis resulting from her tubing accident and her underlying medical condition. (See Pl.'s Test.) In addition, for approximately one month following her termination, Norton was experiencing a severe reaction to medications she was taking for what was then believed to be conversion disorder. (See Pl.'s Test.) Her symptoms included swelling of her arms and hands as well as severe fatigue and shortness of breath. (See Pl.'s Test.) During this time Norton needed medical care but was without a primary care physician because LFP had discharged her as a patient. As a result of not having a primary care physician, Norton ended up resorting to the emergency room for her care on at least one occasion after March 11, 2003. (See Pl.'s Test.) Norton was eventually able to locate a replacement primary care physician towards the end of April 2003. (See Pl.'s Test.)

Norton experienced stress and depression as a result of her termination as an employee of LFP. (See Pl.'s Test.) Norton felt that she was a valuable employee and was distraught by

LFP's lack of willingness to accommodate her condition. (See Pl.'s Test.) She was also overwhelmed by stress and emotional distress as a result of the sudden loss of income and health insurance coverage and the impact that these losses had on her entire family. (See Pl.'s Test.)

Norton did manage to find other work shortly after her termination from LFP. From mid-April 2003 through January 2004, Norton worked on-and-off as a substitute school nurse. Since then, Norton has worked as a doula running her own business, Natural Childbirth Alternatives. (See Pl.'s Test.) At the damages hearing, Norton testified that she didn't care so much about the money as much as she wanted to stand up for herself and have confirmation that her termination was, in fact, wrongful. (See Pl.'s Test.)

## II. CONCLUSIONS OF LAW

### A. Employment Termination Claim

Throughout Norton's employment, LFP operated a "program or activity receiving Federal financial assistance" within the meaning of the Rehabilitation Act, 29 U.S.C. § 794. (See Pl.'s Compl. ¶ 10.)[1] In employment discrimination cases, the Rehabilitation Act expressly adopts the liability standards of the Americans with Disabilities Act ("ADA"). See 29 U.S.C. § 794(d). The ADA and the MHRA prohibit an employer from firing a "qualified individual with a disability because of the disability" of the individual. See 42 U.S.C. § 12112(a); 5 M.R.S.A. § 4572(2). To establish her claim that her employment was terminated because of her disability, Norton must show (1) that she suffers from a disability within the meaning of the Rehabilitation

---

[1] As a result of the entry of default, LFP "is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated." Ortiz-Gonzalez v. Fonavisa, 277 F.3d 59, 62-63 (1st Cir. 2001) (quoting Franco v. Selective Ins. Co., 184 F.3d 4, 9 n.3 (1st Cir. 1999).

Act and the MHRA[2]; (2) that she was able to perform the essential functions of the job, either with or without reasonable accommodation; and (3) that LFP discharged her because of her disability. See Oliveras-Sifre v. Puerto Rico Dep't of Health, 214 F.3d 23, 25 & n.2 (1st Cir. 2000); Doyle v. Dep't of Human Services, 824 A.2d 48, 54 (Me. 2003).

Here, at all material times, Norton had a disability within the meaning of the Rehabilitation Act, namely, she had a physical or mental impairment that substantially limited one or more of her major life activities. (See Pl.'s Compl. ¶ 11.) At all material times, Norton also had a physical or mental disability within the meaning of the MHRA, 5 M.R.S.A. § 4553(7-A). (See Pl.'s Compl. ¶ 12.) At all material times, Norton was qualified to work for LFP as a medical assistant. (See Pl.'s Compl. ¶14.) On February 28, 2003, LFP intentionally terminated Norton's employment solely because of her disability. (See Pl.'s Compl. ¶¶ 16, 21.)

**B. Retaliation Claim**

Norton also claims that she was unlawfully retaliated against in that she was fired as a patient of LFP for opposing a practice made unlawful by the Rehabilitation Act and the MHRA. Both the Rehabilitation Act and the MHRA prohibit retaliation for opposing alleged violations of those statutes. See 42 U.S.C. § 12203(a); 29 U.S.C. § 794(d); 5 M.R.S.A. §§ 4572(1)(E), 4553(10)(D). Moreover, by incorporating the standards of Title VI of the Civil Rights Act of 1964, the Rehabilitation Act proscribes that "no recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [the Rehabilitation Act or its implementing regulations]." 45 C.F.R. § 80.7(e) (Title VI regulation); 45 C.F.R. § 84.61 (Rehabilitation Act regulation adopting Title

---

[2] The Rehabilitation Act defines an individual with a "disability," in part, as a person who has "a physical or mental impairment which substantially limits one or more of such person's major life activities." 29 U.S.C. § 705(20)(B)(i). The Maine Human Rights Act has a broader definition of "physical or mental disability." See 5 M.R.S.A. § 4553(7-A)(2000); Rozanski v. A-P-A Transport, Inc., 512 A.2d 335, 340 (Me. 1986).

VI regulation); 29 U.S.C. § 794a(a)(2) (Rehabilitation Act adopts the remedies, procedures, and rights of Title VI). Cf. Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 28 n.6 (1st Cir. 2002) (applying Title VI Department of Education anti-retaliation regulation to the Rehabilitation Act).

Here, on February 28, 2003 and thereafter, Norton opposed the unlawful discrimination discussed above. (See Pl.'s Compl. ¶ 17.) On March 11, 2003, LFP intentionally retaliated against Norton by discharging her as a patient. (See Pl.'s Compl. ¶¶ 19, 21.) This retaliation was undertaken solely because of Norton's disability. (See Pl.'s Compl. ¶ 21.) LFP's retaliation against Norton was undertaken for the purpose of interfering with Norton's rights under the Rehabilitation Act and its implementing regulations as well as the MHRA. (See Pl.'s Compl. ¶ 20.)

### C. Damages

As a result of LFP's unlawful discrimination and retaliation against Norton, she has suffered from a loss of benefits, loss of enjoyment of life, loss of self-esteem, emotional distress, pain and suffering, and other pecuniary and non-pecuniary losses. (See Pl.'s Compl. ¶ 22.) Plaintiff has requested a damages award totaling $85,000.00. However, having listened to Plaintiff's testimony, which was the only evidence submitted to the Court at the damages hearing, the Court concludes that an award of $85,000.00 would overcompensate Plaintiff for the nonpecuniary losses actually incurred as a result of Defendant's discriminatory termination of her employment and the retaliatory termination of her doctor-patient relationship.

Nonetheless, Norton is entitled to recover some amount of compensatory damages with respect to her claims under the Rehabilitation Act because she has shown intentional discrimination. See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126-27 (1st Cir. 2003);

McKay v. Winthrop Bd. of Educ., No. Civ. 96-131-B, 1997 WL 816505, at *3 (D. Me. June 6, 1997) (citing Niece v. Fitzer, 922 F. Supp. 1208, 1219 n.9 (E.D. Mich. 1996)); Lussier v. Runyon, Civ. No. 92-397-P-H, 1994 WL 129776, at *11 (D. Me. 1994); Doe v. District of Columbia, 796 F. Supp. 559, 571-73 (D.D.C. 1992).  The Court hereby awards Norton $7,500 under the Rehabilitation Act for loss of enjoyment of life, loss of self-esteem, emotional distress, pain and suffering, and other non-pecuniary losses.

With respect to the MHRA claim, Norton exhausted her administrative remedies at the Maine Human Rights Commission as is required by 5 M.R.S.A. § 4622.  (See Pl.'s Compl. ¶¶5-6.)  The Maine Human Rights Commission found in Norton's favor on her employment termination claim.  (See Pl.'s Compl. ¶6.)  Therefore, the Court also awards Norton an additional $7,500 civil penalty with respect to her claims under the MHRA.  See 5 M.R.S.A. § 4613(2)(B)(7).

### III. CONCLUSION

On the basis of the above findings and conclusions, the Court GRANTS Plaintiff's Motion for Entry of Final Default Judgment (Docket # 7) and hereby ORDERS that Judgment on behalf of Plaintiff be entered in the amount of $15,000.

As a result of this Judgment, Plaintiff is also entitled to recover reasonable attorney's fees.  The Court has already received Plaintiff's Application for Attorney's Fees along with the supporting documentation and will issue a separate order on attorney's fees.

SO ORDERED.

      /s/ George Z. Singal  
      Chief United States District Judge

Dated this 17th day of August 2005.